THOMAS J. KARR
Assistant General Counsel
Washington, DC Bar Number 426340

ERIC REICHER
Special Trial Counsel
Washington, DC Bar Number 490866

KAREN J. SHIMP
Special Trial Counsel
Washington, DC Bar Number 456265

U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC  20549-9613
(202) 551- 7921 (Reicher)
ReicherE@sec.gov

*Attorneys for the U.S. SEC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION**, <br><br> Applicant, <br><br> vs. <br><br> **SHAWN F. HACKMAN**, <br><br> Respondent. | Case No.   2:21-cv-01234 <br><br> **APPLICATION FOR AN ORDER UNDER SECTION 21(e)(1) OF THE SECURITIES EXCHANGE ACT OF 1934 ENFORCING COMPLIANCE WITH A COMMISSION ORDER, AND BRIEF IN SUPPORT** |

COMES NOW the U.S. Securities and Exchange Commission ("SEC" or "Commission") and hereby applies to this Court for an order pursuant to Section 21(e)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(e)(1), that requires Respondent Shawn F. Hackman to (1) comply with a final SEC administrative order entered against him on September 10, 2002 (suspending him from appearing or practicing before the Commission as an attorney); and (2) disgorge, with prejudgment interest thereon, the $817,438 compensation he received from appearing and practicing before the Commission in violation of that Commission order.

Respectfully submitted this 30th day of June, 2021.

THOMAS J. KARR
ERIC REICHER
KAREN J. SHIMP

/s/ Eric Reicher
Eric Reicher
Special Trial Counsel

U.S. Securities and Exchange Commission

## INTRODUCTION AND SUMMARY

1.      On September 10, 2002, the Commission entered an order suspending Hackman from appearing or practicing before it as an attorney, pursuant to Rule 102(e)(2) of the Commission's Rules of Practice, 17 C.F.R. § 201.102(e)(2).  *In the Matter of Shawn F. Hackman*, Exchange Act Release No. 46478 (the "2002 Order"), Ex. 1, *also available at* https://www.sec.gov/litigation/admin/34-46478.htm.  The 2002 Order was based on Hackman's disbarment by the Supreme Court of Nevada for misappropriating client funds. *In re Discipline of Hackman* (Nev. No. 38826) (April 3, 2002).

2.      In 2019, Commission staff became aware of evidence that, from at least 2013, Hackman may have been violating the 2002 Order by drafting and providing legal advice regarding documents that were filed with the Commission by a number of public companies, and by directly communicating with Commission staff on behalf of his clients about SEC filings.

3.      The Commission entered a formal order of investigation authorizing members of its staff to investigate whether Hackman had violated, or was violating, the 2002 Order.  The staff found, through sworn testimony and documents produced by witnesses (including Hackman), that following Hackman's disbarment and suspension he was employed by two Nevada law firms as a "paralegal," but was permitted to engage in the practice of law—and to appear or practice as an attorney before the Commission—by, among other things, drafting SEC filings for numerous public companies and communicating with Commission staff regarding certain of those filings. Representative documents and testimony that support the staff's findings, and this Application, are attached as exhibits.  *See* Ex. 2 (Declaration of Eric Reicher).

4.      During its investigation, the staff took sworn testimony from Hackman and subpoenaed records relevant to his work on SEC filings.  After initially answering questions posed by Commission staff, Hackman later extensively, but selectively, invoked his Fifth

Amendment right against self-incrimination and refused to answer numerous questions concerning whether he functioned as an "attorney" in drafting SEC filings for approximately 80 public companies. Hackman's extensive invocation of the Fifth Amendment warrants an adverse inference that he acted as an attorney in connection with those SEC filings. *See, e.g., SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from the failure of proof.").

5.      Documents and sworn testimony obtained during the staff's investigation also established that Hackman was paid approximately $817,438 for work performed in violation of the 2002 Order from January 1, 2016 to the present, including payments from the law firms who employed him and payments from clients who paid him directly for his legal work on SEC filings. See Facts Section II, below, and Ex. 2 (Decl. of Eric Reicher at ¶¶ 150-152).

## PARTIES

6.      **The Commission** is an independent agency of the United States Government. The Commission's principal office is located at 100 F Street N.E., Washington, DC 20549.

7.      **Shawn F. Hackman**, age 52, resides in Las Vegas, Nevada. Hackman was admitted to the Nevada bar in 1996, but was disbarred in 2002 for misappropriating client funds. *See In re Discipline of Shawn Hackman* (Nev. No. 38826) (April 3, 2002).[1] The Commission's 2002 Order remains in effect, and Hackman remains disbarred from the practice of law.

8.      In addition to his disbarment and the 2002 Order that stemmed from it, (A) the United States District Court for the District Court of Nevada issued an unrelated final

---

[1] Iowa reciprocally disbarred Hackman in 2002. *See In re Shawn Hackman* (Iowa No. 02-0395) (Aug. 29, 2002).

judgment against Hackman in 2003 that included: (i) a permanent injunction against violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933; (ii) disgorgement of $333,645 plus prejudgment interest of $117,302.53; and (iii) a penalty of $450,947.53 (*SEC v. Kankaris Communications, Inc., et al.*, Case No. CV-S-99-0967-LRH (LRL) (D. Nev. Oct. 8, 2003) at Docket Entry 20); and (B) on February 19, 2004, Hackman pled guilty to one count of Racketeering Conspiracy and agreed to a Criminal Forfeiture for his role in yet another unrelated securities fraud (*U.S. v. Chapman, et al.*, Case No. CR-S-03-347-JCM (PAL) (D. Nev. Feb. 19, 2004) at Docket Entry 77).

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this Application pursuant to Sections 21(e)(1) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(e)(1) and 78aa(a).

10.    Venue is proper because certain of the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within this judicial district. Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

## STATEMENT OF FACTS

**I.    Hackman Appeared and Practiced as an Attorney Before the Commission in Violation of the 2002 Order**

11.    From at least 2007 until early 2017, Hackman was employed by the Nevada law firm Harold P. Gewerter, Esq., Ltd. ("Gewerter Law").  Gewerter Law also employed attorney Elaine Dowling ("Dowling") from approximately 2014 until mid-2016.[2]  From mid-2016 to the present, Hackman has been and is employed by the Nevada law firm EAD Law Group, LLP ("EAD Law"), a solo practice owned and operated by Dowling.  At both

---

[2] As reflected in a number of the Exhibits, for a period of time the firm operated as Gewerter & Dowling.  But Dowling was never a partner and the legal name of the firm was never changed, so for simplicity this Application only refers to the two actual firms.

firms, Hackman was ostensibly employed as a paralegal.[3]  However, as noted above, these firms permitted Hackman to engage in the practice of law and to appear and practice before the Commission, in violation of the 2002 Order, by preparing SEC filings for at least 80 public companies.[4] *See* Appendix A.

12.    Hackman's legal work, as relevant here, included regularly:

- Drafting all, or significant parts of, letters to and filings with the SEC;

- Advising that particular revisions be made to documents that would be sent to or filed with the SEC (either explicitly, or inherently through the iterative revision process);

- Drafting and signing opinion letters to be filed with the SEC (through electronic or image-only signatures that facially purported to be Dowling's);

- Answering legal questions related to SEC filings and related laws, rules, and regulations;

- Allowing himself to be referred to as "counsel," "attorney," or a similar term;

- Being paid directly by clients for his legal work;

- Agreeing that the law firms with which he was associated would take on particular matters; and

---

[3] Both Gewerter and Dowling were aware when they hired him that Hackman was a disbarred felon.  Gewerter was also aware of the 2002 Order; it is not clear when Dowling became aware of Hackman's SEC suspension.

[4] On June 29, 2021 the Commission issued Orders Instituting Public Administrative Proceedings against Gewerter and Dowling alleging that each violated their ethical responsibilities by permitting Hackman to engage in the practice of law and appearing or practicing as an attorney before the Commission while employed by their firms. Specifically, each is alleged to have violated Nevada Rules of Professional Responsibility 5.3 (requiring attorneys to properly supervise non-lawyer staff), 5.5(a) (a lawyer shall not assist another in the unauthorized practice of law), and 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation).  Gewerter agreed to an order permanently suspending him from appearing or practicing before the Commission as an attorney.  *In the Matter of Gewerter,* SEC Administrative Proceeding 3-20377, *available at* https://www.sec.gov/litigation/admin/2021/34-92292.pdf.  The administrative proceeding against Dowling is pending.  *In the Matter of Dowling*, SEC Administrative Proceeding 3-20378, *available at* https://www.sec.gov/litigation/admin/2021/34-92293.pdf.

- Agreeing how much the law firms with which he was associated would be paid by clients for particular work.

13.   Specific examples of the work described in Paragraph 12 are provided in subsections A – D below for just a few of Hackman's clients.  The discussion in those sections is only representative; it reflects far less than all the evidence demonstrating Hackman's violation of the 2002 Order.

14.   The following facts are important in understanding the evidence presented as part of this Application:

a.   Even when a draft filing or SEC-related legal advice came from Dowling's or Gewerter's email address, it was often actually Hackman doing the work or giving the advice. [5]  Indicia that an email was actually Hackman's work product include: (A) being sent from a Sprint mobile phone, *see* Ex. 3 (Dowling Tr. at 216:14-18; Dowling uses Verizon); Ex. 4 (Gewerter Tr. at 59:11-16; Gewerter uses Verizon); Ex. 5 (Hackman Tr. at 12:17-13:2; Hackman uses Sprint); (B) being both sent from and simultaneously copied to the same email address, *see* Ex. 6 (Hackman Tr. at 426:8-12) (Hackman invoking the Fifth when asked whether it was "more likely than not" that emails sent from and simultaneously copied to Dowling's address were actually sent by him); and (C) containing incomplete sentences, extreme informality, and multiple typos or similar errors, *see e.g.* Ex. 3 (Dowling Tr. at 208:10-209:7) (acknowledging that Hackman's emails were informal and often contained typos, whereas hers were more "polished").

b.   Similarly, even when an opinion letter or other SEC-related document appeared to have been signed by Dowling, often her "signature" was actually a typed-only or image-only version affixed by Hackman.  *See, e.g.*, Ex. 7 (Dowling Tr. at 377:23-378:9) (it was Dowling's "normal practice to want a wet signature [i.e., an ink signature] on an

---

[5] If the Commission's staff had reason to believe that Dowling or Gewerter may in fact have been the author of or otherwise significantly involved in drafting or reviewing a particular document, it has not submitted that as evidence in connection with this Application.

opinion letter" if she was actually involved).  Hackman took the Fifth when asked whether, "in the vast majority of cases" where an opinion letter was issued over Dowling's electronic signature, "she never reviewed it before it was issued."  Ex. 6 (Hackman Tr. at 422:7-18).  Dowling acknowledged that Hackman provided "legal opinions without my consent pretty rashly.  And without me even knowing."  Ex. 10 (Dowling Tr. at 669:11-16); *see also* Ex. 7 (Dowling Tr. at 509:21-510:19) (Dowling's lack of involvement re Sharp S-1, which included an opinion letter).[6]

### A.    Iarocci-Related Companies[7]

15.    DCA Asset Management ("DCA"), a company purportedly focused on asset management and investment banking services, and Apex 11 ("Apex"), a blank check company, were both controlled by Anthony Iarocci.  Iarocci hoped to register shares of each company with the Commission by filing a Form 10.[8]  Iarocci turned to Hackman to draft the necessary SEC filings.

16.    It was Iarocci's understanding that Hackman was an attorney, and he referred to him as such in written communications.  Ex. 13/TE[9] 3 at p.1 (July 10, 2019

---

[6] On other occasions Hackman drafted and signed (using Dowling's name) attorney opinion letters supporting a client's payment directly to himself.  *See* Ex. 8/TE 1069; Ex. 9/TE 1069A (metadata showing Hackman (whose computer was named "Rumplestiltskin" at the time) last modified the document); Ex. 10 (Dowling Tr. at 663:10-16) (Dowling did not review, sign, or approve the letter); Ex. 6 (Hackman Tr. at 542:25-544:5) (taking the Fifth as to whether Dowling had any involvement in the letter); *see also* Ex. 11/TE 930 and Ex. 12/TE 930A (metadata showing Hackman (whose computer was named "EadLawGroup" at the time) last modified the document); Ex. 3 (Dowling Tr. at 193:23-194:16) (Dowling does not believe she reviewed the opinion letter); and Ex. 6 (Hackman Tr. at 539:9-540:9) (taking the Fifth when asked if Dowling reviewed the opinion letter).

[7] This Application does not, and should not be read as intending to, allege any misconduct by the named companies and individuals other than Hackman, Dowling, and Gewerter.

[8] *See* Appendix B for a list of relevant SEC forms and a brief description of each type.  While counsel does not typically sign SEC filings, preparing all or a portion of an SEC filing constitutes appearing or practicing before the Commission. *See* Commission Rule of Practice 102(f) [17 C.F.R. 201.102(f)] and 17 C.F.R. 205.2(a)(1).

[9] "TE" stands for Testimony Exhibit.  Many of the exhibits used in this Application were also used as exhibits in the Commission's investigative testimony.  This Application

email introducing Hackman as his "SEC attorney"); Ex. 14 (Iarocci Tr. at 55:2-23).  On

August 14, 2020, when advised by corporate counsel to send a final proof of the Apex

Form 10 to "your attorney and your auditors," Iarocci sent the documents to Hackman

(along with the auditor and a non-legal consultant).  Ex. 15/TE 1146 at p. 1.

17.  <u>Legal Advice.</u>  Iarocci testified that he turned to Hackman, not Dowling, for

legal advice on his SEC filings, and that he had no contact at all with Dowling prior to

receiving an SEC subpoena in Fall 2019—well after his companies had relied on Hackman

to prepare a number of SEC filings.  Ex. 14 (Iarocci Tr. at 56:2-57:3; 63:16-64:1; 68:13-

69:13; 73:2-12; 78:24-79:15; 96:23-97:14; 107:1-108:14; 122:10-123:1; 134:11-23).  There is

no indication that Hackman consulted with Dowling prior to responding to Iarocci's legal

questions.  Examples of Hackman's legal advice on SEC-related matters include:

a.  On July 31, 2018, Hackman advised what financial disclosures were

required with a new registration statement and how dividends would be disclosed in a later

filing.  Ex. 16/TE 4 at p. 1.

b.  In an August 6, 2018 email string, Iarocci asked Hackman a series of

questions regarding why language referring to Apex as an "emerging growth

company/blank check" was included in the draft Form 10.  Hackman responded, "Since

the initial Form 10 included the Emerging Growth language and the Company remains a

blank check [] I left this in so as to not generate questions as to what had changed within

the company to merit the removal." After further comment by Iarocci, Hackman

responded, "Yeah its [sic] generic but [has] been approved [by the SEC] many times."  Ex.

17/TE 13 at p.1.  The filed Apex Form 10 stated the company was an "emerging growth

company," consistent with Hackman's advice.  *See* Ex. 18 at p. 2.

---

frequently cites testimony transcripts that refer to documents using the original (TE) exhibit
number, so including that information (where applicable) will aid the Court and parties in
understanding the testimony transcripts.

c.   In a February 4, 2019 email string, Iarocci asked Hackman a series of questions concerning what DCA would have to file regarding Apex 10, another entity Iarocci was in the process of obtaining an interest in.  Hackman advised what information must be disclosed, what other types of filings instead of a Form 10 might be an option, and that additional disclosures may be required if there was a substantial delay between when Iarocci acquired Apex 10 and when DCA made the filing.  Ex. 19/TE 16B.[10]

d.   In a January 17, 2019 email string, Iarocci asked Hackman a series of questions about the process to get the SEC to declare an Apex securities offering effective and options for strategic transactions once Apex's offering was declared effective. Hackman explained the various SEC filings that would be required, including what filings would be required to include shareholders in a separate entity in which Iarocci had an interest.  Hackman further advised on the Board of Directors' obligation to use its reasonable business judgment in assessing any potential strategic transaction.  Ex. 20/TE 18 at p.1.[11]

e.   In a June 25, 2019 email, Apex's auditor told Iarocci he should consult with "SEC counsel" about whether Apex needed to file a Form 10-K (which the SEC had requested), or whether the auditor was correct that an auditor's opinion should be sufficient.  Iarocci forwarded the email to Hackman and asked his opinion, to which Hackman replied "I agree with [the auditor] that a 10k should not be needed." Ex. 21/TE 32 at p.1.

---

[10] Dowling acknowledged that the advice provided by Hackman on this matter constituted legal advice only a lawyer could properly provide, and she had no recollection of Hackman discussing the questions with her before he provided a response to Iarocci.  Ex. 7 (Dowling Tr. at 586:17-587:16).

[11] Dowling acknowledged that the advice provided by Hackman on this matter constituted legal advice only a lawyer could properly provide, and she had no recollection of Hackman discussing the questions with her before he provided a response to Iarocci.  Ex. 7 (Dowling Tr. at 589:6-590:17).

18.   <u>Legal Work Product.</u>   Hackman drafted and/or revised SEC filings for DCA and Apex, and there is no indication that Dowling was involved in that process.  Examples of Hackman's work product include:

a.   On October 9, 2018, Hackman sent a revised draft of the DCA Form 10 that addressed a series of comments raised by the auditor.  Hackman stated, "A couple of these I just said I would add rather than spend the time having the debate."  Ex. 22/TE 5 at p.1.

b.   On July 24, 2018, Hackman sent a revised version of the DCA Form 10 and advised that he has "[j]ust a bit more to do on Apex 11" and hoped to circulate a draft the next day.  The email string also includes an earlier email indicating that Hackman was "making good progress on both Form 10's."  Ex. 23/TE 12 at p.1.

c.   On September 20, 2018, Hackman circulated version five of the DCA Form 10, and on October 11, 2018, he sent version six, both of which he prepared.  Exs. 24/TE 14 and 25/TE 15.

d.   On April 24, 2019, Hackman circulated a draft of Apex's amended Form 10 and an accompanying letter to the SEC,[12] and advised that it would be prudent to increase the stated time it would take to file a 10-K if there was uncertainty as to the ability to meet the then-disclosed timeline.  Ex. 26/TE 24A.

e.   On July 31, 2020, at Iarocci's behest, Hackman was sent a draft of the Apex Form 10 to review.  Ex. 27.  On August 10, 2020, Hackman made certain revisions and indicated it "[s]hould be ready to file."  Ex. 28 at p.1.  The next day he provided a revised draft.  *Id.*  Hackman took the Fifth when asked whether he consulted with Dowling

---

[12] When a company makes certain filings with the SEC (such as an S-1 or Form 10), the SEC will often issue comment letters raising questions or asking that certain disclosures be modified.  The company, in turn, provides a letter response to the SEC and also files an amended version of the document that reflects any changes the company agreed to make.

before determining that the Form 10 was ready to file and whether she had actually reviewed it before it was filed.  Ex. 6 (Hackman Tr. at 430:9-15).

19.    <u>Failure to correct impression Hackman is an attorney.</u>  Iarocci's longtime corporate counsel, Jon Coury, did not have significant experience with Form 10 filings. Ex. 14 (Iarocci Tr. at 29:8-30:17).  Coury deferred to Hackman on securities law issues because he understood Hackman to be an experienced securities law attorney.  For example, on November 11, 2018, Coury provided comments to the DCA Form 10 and stated that he was "deferring ultimately to Shawn and [the auditor] for their expertise relating to the Form 10 and financial statements, respectively."  Ex. 29/TE 7A at p.1.  On November 21, 2018, Coury sent another draft of the DCA Form 10 and asked Hackman whether disclosure language concerning DCA investments was necessary and adequate, and whether certain contracts should be attached as exhibits to the filing.  Hackman advised that the contracts should be included, and that the disclosure drafted by Coury "should be adequate for Form 10 purposes."  Ex. 30/TE 7B at p. 1.  And on December 3, 2018, Coury sent comments regarding the Apex Form 10 and asked Hackman whether the price per share to purchase additional equity was a material term that should be disclosed. (Hackman did not address that question in the email, but did advise on certain other matters relating to the filing.)  Ex. 31/TE 8 at p.1.

20.    On August 24, 2020, Coury recounted to Iarocci a conversation he had with an SEC staff attorney reviewing the Apex Form 10.  Coury noted his thought to create a single response to the comments made by the SEC staff member, stated "some of this will need to address the issues with Apex 11 counsel (Shawn)," and encouraged Iarocci to send it to the "counsel that drafted the Form 10" for a response.  Ex. 32/TE 1097 at p.1.  Iarocci forwarded Coury's email to Hackman and two non-lawyer consultants.  *Id.*  Hackman took no steps to address either (1) Coury's and Iarocci's written statements that Hackman was

Apex's counsel, or (2) Coury's and Iarocci's obvious impression that Hackman was acting as counsel with respect to the Form 10.

21.     Hackman took the Fifth when asked whether he functioned as "counsel" in preparing the various SEC filings made by DCA and Apex, which includes the Form 10s filed by DCA and Apex 11 on January 3, 2019 and December 18, 2018, respectively, and various amendments filed for each company.  Ex. 6 (Hackman Tr. at 433:24-434:18).

                    **B.     Smith-Related Companies**

22.     Two companies controlled by Tracy Smith were Sharp, Inc. and Downkicker, Inc., each of which purported to be in the real estate business.  Smith sought to register Sharp shares with the Commission through an S-1 filing, and to separately make an unregistered offering of Downkicker securities.

23.     Smith only had one very preliminary conversation that included Dowling regarding Sharp, and is unaware of involvement by her on work for Sharp.  Ex. 33 (Smith Tr. at 332:5-21).  Instead, Smith testified that Hackman functioned as his "counsel" for SEC filings on behalf of Sharp, Downkicker, and other entities.  He stated that Dowling was just the "face" of EAD Law, "Shawn is basically doing the work," and it was "pretty well clear and established that he's [Hackman] running the [expletive] place" (meaning EAD Law).  *Id.* at 81:2-22; 264:2-13.[13]

24.     Legal Work Product and Related Advice.  Hackman did the legal work for Sharp's and Downkicker's SEC filings.  Smith testified that he and Hackman "worked daily together to get [the Sharp S-1] done," that Hackman was responsible for "every bit of" the Downkicker Form ID (filed in March 2017), and that Hackman was similarly responsible for the Downkicker Form D (filed in April 2017).  *Id.* at 261:19-262:14; 263:21-264:13; 331:22-332:4.  Examples of Hackman's legal work on SEC documents includes:

---

[13] Smith has a construction background and used the analogy of an individual who could not get a contractor's license (*e.g.* because of a criminal record) paying a fee to a licensed contractor to "rent" use of that person's license.  *Id.*

a.   On August 15, 2019, Smith sent a draft section of the Sharp S-1 for Hackman to review, imploring him, "Let['s] get this done man, I would like to get this filed Friday" and indicating that "I will also work on getting some more cash [for Hackman] for Friday morning."  Ex. 34/TE 679.

b.   On August 28, 2019, Hackman sent Smith a copy of the Sharp S-1 and a document titled "Final Legal Opinion" purportedly signed by Dowling.  Ex. 35/TE 681. Later that day, Smith asked Hackman to make certain revisions to the S-1 and, after making the revisions, Hackman opined the filing "Should be good to go to edgar [the SEC's filing system]."  Ex. 36/TE 682 at p. 1.  Hackman took the Fifth when asked if Dowling had reviewed the Sharp S-1 or accompanying legal opinion letter.  Ex. 6 (Hackman Tr. at 523:9-25).  Dowling testified that she did not recall working on the Sharp S-1 and acknowledged that, if Hackman did that work without her involvement, it would violate his disbarment.  Ex. 7 (Dowling Tr. at 509:21-510:19).

c.   On September 4, 2019, Smith asked Hackman, an auditor, and an accountant to review a draft amendment to the S-1 and give their clearance to file it with the SEC.  Hackman advised the next day, "No comments from here on the body."  Ex. 37/TE 684.  That same day, and in response to the same email, Hackman sent a draft of the subscription agreement (which he had also prepared) that would be used as an exhibit to the amended S-1 filing.  Ex. 38/TE 685.

d.   On August 29, 2019, Smith sent a question regarding the financial statements that would be filed with the Sharp S-1.  The response came from Dowling's email address, but it was actually Hackman responding from his mobile phone.  Ex. 39/TE 680 at p. 1.

e.   On October 17, 2019, Dowling's email address sent (and copied itself on) a draft of an SEC comment response letter.  Ex. 40/TE 690.  Metadata shows that the computer used to last modify the document was named "EadLawGroup," which was the

name of Hackman's computer at the time.  Ex. 41 (showing metadata); Ex. 6 (Hackman Tr. at 482:16-483:3).

   f. On November 4, 2019, Dowling's email address sent a revised S-1 and corresponding comment letter.  Ex. 42/TE 692.  However, metadata shows that Hackman made the last modifications to the document.  Ex. 43.  Smith testified that he believed Hackman sent and prepared the documents without review or other involvement by Dowling.  Ex. 33 (Smith Tr. at 368:12-25).

   g. Hackman regularly texted with Smith about legal issues concerning SEC filings, including how to respond to a comment letter from the SEC regarding Sharp's S-1. *See* Ex. 44/TE 687 at pp. 1, 13-14, 20, 24, 32-34, 40-41, and 45.

   h. An accountant who worked for Smith-related companies frequently asked Hackman to do work on SEC comment letters, or asked Smith to speak to Hackman about matters pertaining to SEC filings.[14]  *See. e.g.,* Ex. 45/TE 688 (asking Hackman to prepare a draft and specifically address issues raised in two SEC comments) and Ex. 46/TE 691 (asking Smith to "go through the rest [of the comment response letter and corresponding changes to the S-1] and with Shawn's help make sure the comments are all addressed and responded to.").  Smith testified that Hackman reviewed the response to the SEC, and he had no reason to believe that Dowling had any involvement.  Ex. 33 (Smith Tr. at 367:7-19).

   25. <u>Direct Payments to Hackman.</u>  Hackman's texts repeatedly refer to Smith making payments directly to Hackman via Chime, a mobile payment platform, for Hackman's legal work.  *See* Ex. 44/TE 687 at 2-3, 5-7, 9, 11, 16, 21-25, 32, 37-38, 40-42. Smith paid Hackman at least $2,260 for SEC-related work on behalf of Sharp and other companies.  *See* Ex. 47/TE 695 (Hackman Chime records showing frequent payments from

---

[14] The obvious inference is that the accountant believed Hackman was Smith's attorney for SEC-related matters.  Hackman took no steps to correct this misimpression.

15

Smith); Ex. 44/TE 687 (at, e.g., pp. 32 and 35-36) (other companies).  Similarly, although Hackman provided invoices from EAD Law for his work on the Sharp S-1, *see* Ex. 48/TE 696, Smith paid Hackman directly (via Walmart2Walmart money transfer) for the work. Ex. 33 (Smith Tr. at 383:8-384:17).  Finally, Downkicker paid Hackman at least $20,000 for his work on the filings.  *See* Ex. 33 (Smith Tr. 318:12-319:6); Ex. 49/TE 672 at pp. 1-5 (showing wires to Hackman's Citibank account); Ex. 50/TE 673 at pp. 3 and 8 (showing payments to Hackman's Wells Fargo account); Ex. 51/TE 674 at pp. 1-4 (showing payments via Square to Hackman's Citibank account).

26.      Hackman took the Fifth when asked if he functioned (1) as an attorney in preparing Sharp's S-1, including the various amendments filed as part of the SEC comment process, and (2) as "counsel" on Downkicker's Form D.  Ex. 6 (Hackman Tr. at 525:1-11, 528:11-24).

27.      Smith testified that, even after the Commission started its investigation of whether Hackman was violating the 2002 Order, in his experience little substantively changed at EAD Law with respect to Hackman's role in preparing SEC filings for clients. He stated that it was "business as usual for the most part [i.e., Hackman doing the legal work] [but it] was a little different outward appearance" with greater attempts to mask Hackman's involvement.  Ex. 33 (Smith Tr. at 366:15-367:6).  He likened the situation to a "chameleon" who has to adjust his appearance to survive.  *Id.*

## C.    Blaszczak–Related Companies

28.      Brian Blaszczak had an ownership interest in, or consulted with, numerous companies.  He worked with Gewerter and Hackman for a number of years through Gewerter Law.  However, starting in approximately 2014, Gewerter became focused on a project in Costa Rica, so Blaszczak turned to Hackman almost exclusively for his SEC-related legal work.  Ex. 52 (Blaszczak Tr. at 54:25-56:14).  He did not substantively deal with Dowling at Gewerter Law.  *Id.* at 51:23-52:7; 57:21-24.  When Gewerter and Dowling

split, he took his business to EAD Law solely because he wanted to continue working with Hackman. *Id.* at 57:25-58:13.[15]  At EAD Law, Blaszczak had very limited substantive interactions with Dowling and continued to turn to Hackman for his legal work on SEC filings. *Id.* at 58:14-59:24.

29.     Blaszczak testified it was his understanding that Hackman was a licensed attorney,[16] he considered Hackman his and his companies' "attorney," and he referred to Hackman as such in written communications.  *See, e.g.,* Ex. 52 (Blaszczak Tr. at 46:3-12; 48:20-49:21); Ex. 53/TE 850 (January 11, 2018 email stating "I have worked with this attorney [Hackman] extensively over the years . . ."[17]).  (Similarly, an individual engaged in negotiations with Blaszczak to buy Tenaya Acquisitions (and who was therefore involved in drafting the SEC filings that would disclose the transaction) understood Hackman to be functioning as "counsel" for Tenaya Acquisitions on the deal and filings. When the proposed transaction soured, the individual addressed his demand letter for damages from Tenaya Acquisitions to "Shawn Hackman, Esq." Ex. 55/TE 127; *see also* Ex. 56/TE 523 and Ex. 57/TE 522.)

30.     At least three of Blaszczak's companies, Tenaya Acquisitions, Inc. ("Tenaya Acquisitions"), Tenaya Group, Inc. ("Tenaya Group"), and Lucent, Inc., sought Hackman's legal assistance with S-1s, related amendments, and other filings with the Commission.  Hackman's legal work for Blaszczak-related companies included:

---

[15] Blaszczak volunteered that, had Hackman started his own firm (or joined a different firm), he would have gone to that firm rather than EAD Law.  *Id.*

[16] Blaszczak knew there was a period of time Hackman had not been permitted to practice law, but it was his understanding that Hackman had been readmitted (or a temporary suspension had lapsed) by the time he worked with him.  Ex. 52 (Blaszczak Tr. at 74:1-23).

[17] Hackman is not named in this email, but in the preceding part of the string someone else wrote "I am sending [a document] to our SEC attorney in 30 minutes."  *Id.*  He sent the document to Hackman and the context makes clear that they are both referring to Hackman.  *See* Ex. 54/TE 851.

a. On March 22, 2016, Blaszczak sent Hackman a version of the Tenaya Acquisitions S-1 and told Hackman he needed his "expertise" and particularly wanted help with "legal jargon on why we are resubmitting [to the SEC] and also I am not sure how to word extending the offering period." Ex. 58/TE 125A.[18] Blaszczak confirmed that he was looking for legal expertise from Hackman. Ex. 52 (Blaszczak Tr. at 79:22-80:13). Three days later, Hackman sent Blaszczak a revised draft of the Tenaya Acquisitions S-1, but noted that he was still reviewing it. Earlier emails in the string make multiple references to Hackman being expected to revise the document. Ex. 59/TE 122 at pp. 1-2.[19]

b. On May 24, 2016, Blaszczak sent Hackman a Tenaya Acquisitions S-1 amendment and asked Hackman to particularly look at the section explaining why the company was making an amended filing. Ex. 60/TE 524. On May 27, 2016, after Hackman's review, Tenaya Acquisitions filed the amended S-1.

c. On April 18, 2018, Blaszczak sent Hackman a portion from the Tenaya Group S-1 and asked him whether language regarding the share price was properly worded and whether a discussion of funds raised through a private placement was appropriate. Hackman advised, "Both are fine." Ex. 61/TE 125B at p. 1.

d. On April 27, 2018, Hackman sent a final version of the Tenaya Group S-1 attorney opinion letter with an electronic signature purporting to be Dowling's. Ex. 62/TE 532 (email); Ex. 63/TE 532A (letter); Ex. 64/TE 532B (metadata showing Hackman as author and last modifier).[20] The S-1 was filed on May 29, 2018.

---

[18] Although Blaszczak sent the email to Gewerter's address, it asks "Shawn" for assistance and Blaszczak confirmed that he understood Hackman to be both the recipient of the email and the one doing the work. Ex. 52 (Blaszczak Tr. at 84:17-85:5).

[19] This exhibit also mentions Arrington Jones, another company for which Hackman was preparing SEC filings. Hackman took the Fifth when asked whether he functioned as "counsel" on Arrington Jones's SEC filings. Ex. 6 (Hackman Tr. at 451:11-24).

[20] At the time of this letter, Hackman's computer was named "Rumplestiltskin." Ex. 5 (Hackman Tr. at 84:1-19).

e.   Hackman advised on multiple rounds of comment letters with the SEC regarding the Tenaya Group S-1, including advising on certain revisions to the S-1.  *See* Ex. 52 (Blaszczak Tr. at 143:3-145:13); Ex. 65/TE 534; and Ex. 66/TE 535.  The amended S-1, reflecting Hackman's advice, was filed on August 13, 2018.

f.   On April 3, 2020, Hackman sent Blaszczak a draft he had prepared of a Tenaya Group "semi super 8k" to be filed with the Commission to disclose a material agreement.  Ex. 67; *see also* Ex. 52 (Blaszczak Tr. at 155:22-157:14) (Hackman was responsible for preparing the 8-K); and Ex. 68/TE 542 (April 2, 2020 email sending Hackman related documents).  The 8-K reflecting Hackman's advice and work product was filed on May 8, 2020.

g.   On May 29, 2019, Blaszczak emailed the Lucent principals a draft of an S-1 and asked them to "pay the lawyers" because he needed legal input on certain highlighted provisions.  Blaszczak forwarded the email to Hackman asking, "read below S-1 section need your expertise!!!!!!"  Ex. 69/TE 584.  Blaszczak confirmed that he was seeking legal advice from Hackman.  Ex. 52 (Blaszczak Tr. at 259:8-19).  On June 12, 2019, Hackman sent Blaszczak the revisions he advised Blaszczak to make to the Lucent S-1.  Ex. 70/TE 585.  That same day, Dowling's email address sent an S-1 opinion letter with an electronic signature purporting to be Dowling's.  Ex. 71/TE 586 (email) and Ex. 72/TE 586A (attached letter).  Hackman took the Fifth when asked whether Dowling ever reviewed the Lucent opinion letter and whether she authorized him to use her electronic signature on the letter.  Ex. 6 (Hackman Tr. at 575:22-576:8).  Lucent filed its initial S-1 on June 20, 2019 and subsequently filed at least six amendments.  Hackman took the Fifth when asked whether he "functioned as counsel on all of Lucent's SEC filings."  *Id.* at 574:21-575:4.

h.   On April 7, 2020, Blaszczak sent Hackman an email asking for his advice on how to respond to SEC comments concerning the dilution of Lucent shares.  Ex. 73/TE

587.  Blaszczak and Hackman had a call to address the question; Dowling did not participate.  Ex. 52 (Blaszczak Tr. at 265:23-266:10).

31.    Direct Payments to Hackman.  Blaszczak or his consulting company regularly paid Hackman directly for legal work on SEC-related matters.  *See, e.g.,* Exs. 74/TE 593 (showing $1,085 wire from Blaszczak to Hackman) and 75/TE 594 (showing $5,000 wire from Summit Business Services to Hackman).[21]

32.    Hackman took the Fifth when asked whether he had functioned as "counsel" for all of Tenaya Acquisitions' and all of Tenaya Group's SEC filings.  Ex. 6 (Hackman Tr. at 451:4-451:10; 576:19-577:6).  He likewise took the Fifth when asked whether he functioned as "counsel" in preparing Lucent's SEC filings.  *Id.* at 574:18-575:4.

### D.    Southworth-Related Companies

33.    Failure to correct impression Hackman is an attorney.  Kim Southworth owns or consults for a number of companies.  He acknowledged that Hackman functioned as his "attorney" for a number of those companies.  Ex. 77 (Southworth Tr. at 382:24-383:1).[22]  He repeatedly referred to Hackman as his "attorney" in email communications, and asked Hackman to do the "legal" review of documents.  *See, e.g.,* Ex. 79/TE 46 at pp. 1-3 (sending Hackman questions he said would be answered by "my attorney") and Ex. 78 (Southworth Tr. at 76:4-9, confirming he was referring to Hackman); Ex. 80/TE 47A at p. 1 (stating a prior "transaction went through my attorney who at the time was with the law firm of Harold Gewerter") and Ex. 78 (Southworth Tr. at 78:12-20, confirming he was

---

[21] At least one payment may have been for Tenaya work.  *See* Ex. 52 (Blaszczak Tr. at 300:16-301:13).  Other payments were for work on behalf of other Blaszczak-related companies.  *See, e.g.,* Ex. 76/TE 941 at p. 1 ($500 Venmo payment for "Astika S-1").

[22] Southworth acknowledged he knew Hackman had been disbarred, but he believed Hackman still had the knowledge to function as securities counsel and was cheaper than other (licensed) attorneys.  Ex. 78 (Southworth Tr. at 68:14-24; 106:20-25). It is not clear whether Southworth, a lay person, understood the implications and potential ramifications of hiring a disbarred lawyer to act as his "attorney."

referring to Hackman); Ex. 81/TE 48A at p. 1 ("I will just have you [Hackman] be the attorney behind" a project and discussing various SEC filings); Ex. 82/TE 114 at p. 1 (stating "I finally got the attorney to finish it up and get it over to me" in response to an email from Hackman attaching an S-1 for Granito[23]); Ex. 77 (Southworth Tr. at 300:5-13) (confirming he was referring to Hackman); Ex. 83/TE 130 at pp. 1-2. Southworth did not work much with Dowling when she and Hackman were at Gewerter Law, and when he has needed legal work since the formation of EAD Law he has turned to Hackman. Ex. 78 (Southworth Tr. at 21:9-17). Hackman did not make any efforts to correct the impression he was an attorney, even when specifically referred to as such in Ex. 81/TE 48A. Hackman took the Fifth when asked whether he "function[ed] as Mr. Southworth's attorney for many entities that he had an interest in." Ex. 6 (Hackman Tr. at 449:19-25).

34.     Gold Standard Mining Company ("GSMC") was a Southworth-related blank check company Hackman represented in connection with the S-1 registration process. Hackman drafted its SEC filings, including its original S-1 filed May 3, 2017 and numerous subsequent filings. Examples of Hackman's legal work for GSMC include:

a.     On January 19, 2017, Hackman sent Southworth and an accountant a draft he had prepared of the GSMC S-1. Ex. 84/TE 68. He sent another draft on April 2, 2017. Ex. 85/TE 69. On April 4, 2017, Hackman made revisions in response to comments from the accountant. Ex. 86/TE 71A; Ex. 87/TE 70.

b.     On May 8, 2017, the accountant asked whether certain documents should be filed as an amendment. Hackman responded that, in light of discussions with the SEC reviewer who did not mention the documents, he recommended against filing an amendment at that time. Ex. 88/TE 49 at p.1. (The accountant's email also raised questions regarding SEC filings for Triton Acquisitions, Anfield Acquisitions, and

---

[23] Granito was another client for which Hackman drafted and advised on SEC filings in violation of the 2002 Order. Hackman took the Fifth when asked whether he served as "counsel" for Granito. Ex. 6 (Hackman Tr. at 449:19-21).

Fortuneswell, three other Southworth entities for which Hackman did work in violation of the 2002 Order.)

       c.  On September 8, 2017, Dowling's email address sent a revised draft of the GSMC S-1, indicating "*I* have also added the 6 months column . . ." Ex. 89/TE 72A at p. 1 (italics added). Track changes show it was Hackman who made the revisions, *see* Ex. 90/TE 72B, and the document's metadata shows that he authored and last modified the document, *see* Ex. 91/TE 72C. There are other examples of Hackman using Dowling's email to convey drafts of GSMC filings, particularly when the auditor (Brad Hersack) was included in the email strings. *See, e.g.,* Ex. 92/TE 73 and Ex. 93/TE 75.[24] Southworth testified he had no reason to believe Dowling was involved in the review of these drafts, even though they were sent from her email address. Ex. 78 (Southworth Tr. at 144:16-20; 151:1-21).

       d.  On November 20, 2017, Southworth asked Hackman to review a draft post-effective amendment for GSMC's Form S-1 and inquired whether information regarding GSMC's ownership had been adequately disclosed. Hackman opined that the disclosure was adequate and advised against making changes. Ex. 96/TE 76 at p. 1. Two days later, GSMC filed the post-effective amendment reflecting Hackman's legal advice.

       e.  On March 27, 2018, Hackman sent a draft he had prepared of the GSMC 10-K to be filed with the Commission. Ex. 97/TE 77. GSMC filed its 10-K on March 30, 2018.

     35.  <u>Direct Payments to Hackman</u>. Southworth paid Hackman directly for at least some of his work on GSMC's filings. Ex. 98/TE 79 (March 23, 2018 $250 invoice); Ex. 99 at p.1 (March 27, 2018 $250 deposit to Hackman made from Southworth's Arizona

---

[24] In a part of the string that did not include Hersack, the accountant asked "Shawn" to make certain changes even though the email was sent to Dowling's address. Ex. 92/TE 73 at p. 1. The revised document was sent from Dowling's email address, but metadata and track changes show it was Hackman making the changes. Ex. 94/TE 73A (metadata) and Ex. 95/TE 73B (track changes).

hometown).  The entity that subsequently took control of GSMC directly paid Hackman an additional $10,000.  *See Id.* at 2 (showing $10,000 payment on August 3, 2018); *see also* Ex. 100/TE 707 at p. 1 (board resolution authorizing $7,500 payment to Hackman; it is not clear why the final payment was higher than authorized).  Other direct payments to Hackman for SEC-related work on behalf of Southworth-related companies include: Exs. 101/TE 52 and 102/TE 545 (collectively showing $4,000 payment for SEC filings); Ex. 103/TE 1030 (two checks totaling $5,000, labeled "legal/Reg A plus" and "legal/Reg A+ Commerce Holdings," respectively); Ex. 104/TE 1147 (referencing two payments via Zelle totaling $550 for "legal services"); Ex. 6 (Hackman Tr. at 627:3-19, taking the Fifth regarding whether numerous payments, including one for $4,800, deposited from Southworth's hometown in Arizona were from Southworth and for "legal work").

> ## E.  Other Indicia Hackman Acted as an Attorney in Connection with SEC-Related Legal Work.

36.  The descriptions of Hackman's legal work in connection with SEC filings and related SEC matters described in Subsections A – D are representative of the work he performed not only for the companies discussed, but also on SEC filings and related SEC matters on behalf of each of the companies identified in Addendum A to this Application. Hackman exercised his Fifth Amendment rights when asked whether Gewerter or Dowling supervised his work on SEC filings, Ex. 6 (Hackman Tr. at 400:14-22 and 403:11-17),[25] and when asked whether he functioned as "counsel" for each of these companies' SEC filings. *See id.* at *passim*.

---

[25] Hackman's transcript refers to TE 1092 and TE 1092A, attached here as Exs. 105 and 106, which are list of securities law clients prepared by Hackman himself.  The companies listed in Appendix A are similar to those in the testimony exhibits, but certain companies are excluded from the appendix because Hackman's securities work for the companies did not involve SEC filings; conversely, Appendix A includes some companies Hackman did SEC filings for that were not on Ex. 105/TE 1092 and Ex. 106/1092A.

37.     In addition to the specific work product reflecting Hackman's legal drafting and revisions on SEC filings and comment letter responses, the emails and texts reflecting Hackman's legal advice relating to SEC matters, and the testimony from several witnesses that Hackman functioned as their attorney, there are other indicia that Hackman was acting as an attorney in connection with SEC-related matters.  As with the evidence described thus far, this section enumerates only representative examples of these indicia.

38.     <u>Lack of Supervision.</u>  There is little evidence of Gewerter or Dowling supervising Hackman in any way,[26] and abundant evidence that Hackman was working on his own most of the time.  (As noted above, even clients had the impression that Hackman was the one actually running EAD Law's SEC-related practice.)  *See, e.g.*, Ex. 107/TE 813 (Travel records showing Gewerter was out of the country a significant part of 2015 and 2016); Ex. 52 (Blaszczak Tr. at 54:10-15, "Harold's primary business at the time – he was representing some casino in Costa Rica.  So he was never there"); Ex. 108 (Polanco Tr. at 92:16-93:1) (Dowling would often say "Ask Shawn" when substantive securities law questions were raised); Ex. 5 (Hackman Tr. at 133:4-6) (Dowling works about "twenty [hours per week], maybe a little less."); Ex. 109 (Denham Tr. at 83:15-84:4; 103:13-104:10; 110:5-111:7; 124:25-125:6; 144:8-24). Ex. 110 (Hale-Gould Tr. 39:17-20; 56:4-11; 63:10-15; 120:11-22; 129:4-25; 216:18-217:3; 220:8-13), and Ex. 108 (Polanco Tr. at 39:6-24; 67:21-70:10; 287:23-288:17; 303:20-304:3)  (similarly testifying that Dowling was rarely in the office, and Hackman was responsible for the day-to-day operations of the firm).  Hackman took the Fifth when asked about supervision of his SEC-related work for a number of specific companies.  *See, e.g.,* Ex. 6 (Hackman Tr. at 400:14-22; 403:15-17; 445:4-16; 451:19-24; 459:16-21).

---

[26] Because, as noted in the text, neither Gewerter nor Dowling is regularly in the office, one would expect to find emails from Hackman to Gewerter / Dowling showing his proposed work product, and from Gewerter / Dowling to Hackman with comments on his work product.  In fact, there are few such examples until the events described in Subsection F, below.

39.     <u>Work for EAD Law Clients Nominally Represented by Yet Another</u> <u>Attorney.</u>  In December 2019, OTC Markets placed Dowling on its Prohibited Attorney List, meaning opinion letters over Dowling's signature are no longer accepted.  EAD Law clients who needed that service transitioned to a different attorney to sign opinion letters. Hackman immediately began advising that attorney about what to include (or not) in SEC filings, including post-effective S-1 amendments filed in April and May 2020.  *See, e.g.,* Ex. 111/TE 896 at p. 1 (Hackman advising that coronavirus disclosures are not necessary); Ex. 112/TE 898 at pp. 1-2 (the attorney more broadly seeking Hackman's advice on how to respond to SEC comments).  Hackman took the Fifth when asked whether he was acting as a lawyer in advising the new attorney.  Ex. 6 (Hackman Tr. at 568:25-569:25).

40.     <u>Failure to Correct Impression Hackman is an Attorney.</u>  Hackman effectively held himself out to the public as an attorney.  As noted throughout Subsections A – D, even clients believed that Hackman was an attorney and was functioning in that capacity for the SEC-related work he did on behalf of each of the clients' companies. Hackman did not disabuse his clients of that notion.  Other examples where Hackman knew or should have known he was perceived as an attorney, but did not take any steps to correct that misimpression, include: Ex. 113/TE 334 at p. 2 ("I have include[d] Shawn Hackman in this email as he is counsel"); Ex. 114/TE 885 at p. 1 (email referencing "Shawn Hackman, Esq."); Ex. 115/TE 906 at p. 2 (an oil attorney in Texas "is not [our] SEC lawyer as you are"); Ex. 116/TE 891 at p. 1 ("A good securities lawyer for your Reg [A filing] is Shawn Hackman . . . I have used him for nearly 20 years"); Ex. 117/TE 1090 ("I have Cc'd my attorney [Hackman] and he is happy to assist"); Ex. 118 at p. 1 ("could you send the 8 A to Shawn our attorney before filing"); Ex. 119 at p. 1 (when asked if a client could provide Hackman's name to someone looking for a "good attorney", Hackman responds "Sure. Thanks"); Ex. 120/TE 699 at p. 1 (Dowling's email address saved and

shown as "Shawn Attorney LV Energy Conv[27]"); Ex. 121/TE 1091 at p. 1 (Gewerter's email address saved and shown as "Shawn Hackman Vegas Attorney"); Ex. 122 at p. 1 (Gewerter's email address saved and shown as "Shawn Lawyer").

41.     In addition, Hackman's EAD Law business card listed his *Juris Doctor* degree, but did not indicate either that he was a paralegal or that he was disbarred.  Ex. 123/TE 758 (business card).  And, for much of the relevant period, his email signature also failed to indicate that he was a paralegal or legal assistant, *see, e.g.,* Ex. 124/TE 28 at p. 1, even though the firm's other paralegals/legal assistants were so identified, *see, e.g.,* Exs. 125/TE 822 at p. 1 (Denham), 126/TE 645 at p. 1 (Polanco), and Ex. 127/TE 746 (Hale-Gould).  These actions had the effect of creating the misleading impression that Hackman was an attorney.

42.     Selective Invocation of the Fifth Amendment.  As noted throughout Subsections A – D, Hackman frequently invoked his Fifth Amendment privilege against incrimination.  He did not do so as a blanket response or reflexively as to all questions, however.  For example, he denied working on "all" the SEC filings for Telupay and, separately, on "all" the filings for Celexus.  Ex. 6 (Hackman Tr. at 536:11-537:8).  However, he took the Fifth when asked whether he had worked on "any" filings for Telupay and "most" of the filings for Celexus, and he also specifically took the Fifth when asked about work on late summer and fall 2019 filings for those companies.  *Id.*  Other examples of his selective invocation include regarding Tribus, AS Capital, and Healthcare Integrated Technologies Inc. (fka Tomichi Creek Outfitters), where he invoked the Fifth as to some filings for each company, but specifically denied working on other filings for each.  *Id.* at 480:7-481:4; 481:23-482:4; 498:13-499:14; 553:13-554:20.  More generally, Hackman denied that he functioned as the attorney for "all" SEC filings at Gewerter Law and EAD

---

[27] Energy Conversion Services, Inc. is a company for which Hackman prepared SEC filings. *See, e.g.,* Ex. 6 (Hackman Tr. at 542:17-22) (Hackman taking the Fifth when asked if he "function[ed] as securities counsel for all of Energy Conversion's SEC filings").

1   Law during relevant time periods, but took the Fifth when asked whether he functioned as

2   the attorney for the "vast majority" of those filings.  *Id.* at at 446:4-20.

3       43.    <u>Income.</u>  Hackman's income was comparable to what would be expected of

4   an attorney in Las Vegas, as opposed to a paralegal, in terms of both quantity and form.

5   As discussed above, there are numerous examples of Hackman being paid directly by

6   clients for legal work he performed on their behalf.[28]  In addition to cash, a number of

7   clients also paid Hackman in the form of stock for his legal work.[29]  He was paid based on

8   the amount of fees the firm received (40 – 45%), whereas the actual paralegals were paid

9   either hourly or a fixed salary.  Ex. 5 (Hackman Tr. at 169:24-170:9 (re Gewerter Law) and

10  202:2-6 (re EAD Law)); Ex.109 (Denham Tr. at 149:5-8); Ex. 108 (Polanco Tr. at 120:22-

11  121:2); Ex. 110 (Hale-Gould Tr. at 82:10-13).   And the amount of Hackman's pay was far

12  above both the norm for paralegals in the Las Vegas area and what paralegals were paid by

13  both Gewerter Law and EAD Law.  Ex. 6 (Hackman Tr. at 503:9-15).  As detailed in

14  Section II below, Hackman received $492,174 from Gewerter Law in 2016 alone—

15  significantly more than Dowling, an actual licensed attorney, was paid.[30]  And he was paid

16  an average of $178,000 per year by EAD Law from 2017-2019, whereas EAD Law staff

17  who actually functioned as paralegals were paid approximately $32-52,000 per year (which

18  is consistent with the market rate for paralegals in Las Vegas).  Ex. 109 (Denham Tr. at

19

20  [28] Direct payments to Hackman include payments made to any of Hackman's companies:
    Masterful Consulting, LLC, Statewide Secretarial Services, Inc., TCISHOT Business

21  Services, Inc., and Port Side Consulting, LLC.  *See* Ex. 5 (Hackman Tr. at 155:5-20; 156:18-
    157:11) (acknowledging that payments to any of these companies was effectively a payment

22  directly to him).

23  [29] Ex. 128/TE 931 (50,000 shares in Celexus); Ex. 129/TE 874 at p. 2 (30,000 shares in
    Alpha Energy, Inc. for "Shawn, our securities attorney"); Ex. 130/TE 505 at p. 31 (325,001

24  shares in Megas, Inc.); Ex. 131 at p. 27 (250,000 C Wolters Consultants, Inc. shares).

25  [30] Ex. 5 (Hackman Tr. at 177:4-17).  Similarly, clients often paid Hackman more than they
    paid Dowling.  *Compare, e.g.,* Ex. 132/TE 503 and Ex. 133/TE 504 (Tribus paid Hackman

26  $7,650 but EAD Law only $5,000 for an S-1); Ex. 134/TE 500 and Exs. 135/TE 501 and
    136/TE 502 (She Beverage paid Hackman $10,200 but EAD Law only $2,500 for an S-1).

27

28

304:5-20); Ex. 108 (Polanco Tr. at 120:22-24); Ex. 110 (Hale-Gould Tr. at 84:15-85:2); Exs. 137 - 140/TE 653-656 (Las Vegas paralegal salary information from national websites such as Glassdoor.com).

44.     None of Hackman, Gewerter, or Dowling could provide a credible explanation for Hackman's pay other than the obvious inference that he was being paid at an attorney rate.  *See* Ex. 5 (Hackman Tr. at 182:3-15; 193:3-12) (acknowledging why someone looking at his pay could believe he was functioning as a lawyer, not a paralegal); Ex. 3 (Dowling Tr. at 271:14-272:13) (she paid him what she did because "He's experienced and smart," but refusing to explain how his experience or intelligence could justify that pay for a paralegal); Ex. 4 (Gewerter Tr. at 97:24-99:23) (claiming he simply had a general sense of what the work was worth, but unable to explain how paralegal work could be worth so much).

## F.     Attempts to Create a Façade that Hackman was a Supervised Paralegal

45.     After the Commission's investigation intensified, Hackman started creating a paper trail to present the façade that Dowling reviewed his work even though no such review actually occurred.  Three examples:  (A) On August 27, 2020, Hackman sent Dowling a draft attorney opinion letter to be filed with the Farstar, Inc. S-1 "for review and signature."  Ex. 141/TE 1141 at p. 1.  Fewer than two minutes later, Hackman sent an electronically-signed version of the opinion letter (and another document) to the service that makes filings through the SEC's EDGAR system.  Ex. 142/TE 1142.  (B) On July 17, 2020, Hackman sent a draft attorney opinion letter to Dowling for her "review and sig."  Approximately 35 seconds later, he sent the letter to the client.  Ex. 143/TE 1143 (including both emails).  (C) On October 5, 2020, Hackman sent Dowling a 42-page draft of an S-1 for Glohab.  Fewer than 1.5 hours later, Hackman sent the exact same document, without a single change having been made, to the client. Ex. 144/TE 1144 (including both

emails); Reicher Decl. at ¶146.  These are thus three more examples of Hackman violating the 2002 Order.

46.     Hackman took the Fifth when asked whether Dowling actually reviewed these documents, whether he sent the documents to simply create a record of showing that he gave Dowling an opportunity to review them, and whether he had "any intention of her actually reviewing the" documents.  Ex. 6 (Hackman Tr. at 417:15-418:2; 420:15-421:22; 424:11-24).

### G.     Hackman also Violated the 2002 Order by Engaging in Direct Communications with Commission Staff.

47.     In late June 2019, Hackman, acting in the capacity of "company counsel" for AS Capital, Inc., engaged in a call with counsel for the prospective buyer of Hackman's client and an attorney in the Commission's Division of Corporation Finance ("Corporation Finance") (which reviews corporate filings).  The call related to questions raised by Corporation Finance about whether certain of the company's filings failed to adequately disclose the status of the pending transaction and what contingencies would need to be met for the transaction to close.  *See* Ex. 145 (Decl. of Joseph McCann at ¶¶ 5-7); Ex. 146/TE 859 at p. 2 (buyer's counsel stating, "Shawn and I had good results the last time we called" the SEC).  When asked whether he functioned as counsel on this call and, separately, whether such work violated the 2002 Order, Hackman invoked his Fifth Amendment rights.  *See* Ex. 6 (Hackman Tr. at 552:12-553:12).

48.     On or about November, 13, 2018, Hackman called an attorney in Corporation Finance and advocated for his client's S-1 registration to become effective before the financial disclosures in the filing became stale.  *See* Ex. 147 (email from the

Corporation Finance attorney indicating that "Counsel did not leave *his* name but sounded like *he* works for Elaine Dowling") (italics added).[31]

## II.   Calculation of Payments to Hackman for Work that Violated the 2002 Order.

49.     The Commission's disgorgement calculation is based on Hackman's own testimony, clients' testimony, and records received in response to subpoenas to numerous individuals, companies, and relevant banks.  Wells Fargo, N.A., where both Gewerter Law and EAD Law maintain accounts, produced hundreds of checks each firm issued to Hackman, which have been compiled into a summary spreadsheet for the Court's convenience.  Ex. 149.[32]  Hackman's accounts at Wells Fargo, Citibank, N.A., and Bank of America, N.A. revealed payments from many clients, as did bank records from clients.  Hackman directly produced some payment information, including records from Chime, Venmo, PayPal, and Zelle.  We compiled the amounts received from all these various sources to calculate the total payments Hackman received.  *See* Ex. 2 (Reicher Decl. at ¶¶ 151-153).[33]

50.     Total Income.  Gewerter paid Hackman approximately $476,494 in 2016 and $2,390 in 2017.  *See* Ex. 149 at pp. 1-8 (spreadsheet showing payments made by check from Gewerter Law and EAD Law to Hackman and his companies); Ex. 2 (Reicher Decl. at ¶ 151).  As shown in Exhibit 149, Dowling paid Hackman approximately $48,622 in 2016 (at pp. 9-11); $110,765 in 2017 (at pp. 12-15); $215,300 in 2018 (at pp. 16-21);

[31] Hackman was the only male working at EAD Law at the time.  *See. e.g.*, Ex. 148/TE 1080 (Dowling subpoena response listing only female employees).  A male paralegal wasn't hired until fall 2019.

[32] We will provide copies of the numerous checks issued by EAD Law and Gewerter Law and/or additional documentation concerning client payments directly to Hackman (from bank records and otherwise) at the Court's request.

[33] Hackman signed a six-month tolling agreement (Ex. 150), so payments received from 2016 forward are timely for purposes of disgorgement.

$207,739[34] in 2019 (at pp. 22-26); $82,385 in 2020 (at pp. 27-29); and $5,650 through late May 2021 (at pp. 30-31). Clients directly paid Hackman approximately $324,854[35] from January 1, 2016 through late May 2021. Ex. 2 (Reicher Decl. at ¶¶ 152-153).

51.     Hackman (and his companies) had de minimis business expenses in connection with the legal work he performed, and Hackman was not responsible for EAD or Gewerter Laws' expenses. Ex. 5 (Hackman Tr. at 160:1-161:16) (Hackman's companies never paid rent; the only expenses Hackman mentioned were buying computer toner and briefly hiring a high school student); *id.* at 173:17-174:4; 196:5-14 (except for rare de minimis expenses like buying paper if Dowling was unavailable to write a check, Hackman was not responsible for firm expenses).

52.     <u>Percentage Attributable to Work Performed in Violation of the 2002 Order.</u> While all of Hackman's income outlined above likely came from work that violated his disbarment, not all of it violated the 2002 Order (which is limited to prohibiting Hackman from appearing or practicing before the Commission). This Application seeks disgorgement only of amounts related to Hackman's SEC-related work.[36]

53.     Hackman testified that approximately 75% of his income from Gewerter Law in 2016 related to preparing SEC filings. Ex. 5 (Hackman Tr. at 215:25-216:20). Using Hackman's own estimate, the disgorgeable amount he earned from Gewerter Law in

---

[34] The spreadsheet attached as Ex. 149 shows only $205,949 in 2019 and only $78,985 for 2020 because it includes only payments made by check. The total figures listed in the text include payments through electronic platforms such as Venmo, PayPal, and Zelle. *See, e.g.,* Exs. 151, 152, and 153.

[35] *See* Ex. 2 (Reicher Decl. at ¶153). The total shown here is almost certainly an underestimate of what Hackman was actually paid directly. There were many deposits to Hackman's accounts for which the source of the money was not clear. Because our calculations include only payments where there is a specific basis to believe they relate to legal work on SEC filings, at least some payments for other SEC-related legal work are likely excluded. In addition, this figure excludes the value of the shares Hackman received for his legal work.

[36] Non-SEC work by Hackman included, for example, litigation and general corporate matters.

2016 was approximately $357,370 (75% of $476,494).  Hackman was not asked what percentage of his (nominal) Gewerter Law income from early 2017 related to SEC filings, but it is reasonable to assume it was consistent with the 75% from both 2015 and 2016, for a disgorgeable amount of $1,792 (75% of $2,390).

54.     Hackman testified that 60 to 70% of his income from EAD Law in 2017 and 2018 derived from securities or corporate work, and 75 to 80% of that securities/corporate work related to securities filings, for a net estimation that 45% of his income in that period related to SEC filings.  *Id.* at 213:18-22; 214:12-24.  Using Hackman's own estimates and taking the lower of each estimate he provided, a conservative approximation of Hackman's disgorgeable income from 2017 and 2018 is $146,729 (45% of $326,065).[37]

55.     Hackman testified that 50 to 55% of his income in 2019 related to SEC filings.  *Id.* at 215:9-22.  Again accepting his own estimate, a conservative approximation of Hackman's disgorgeable income for 2019 is $103,869 (50% of $207,739).

56.     Hackman was not specifically asked what percentage of his income from EAD Law in 2016, 2020, or 2021 related to SEC filings.  However, it is reasonable to assume it would be consistent with other periods.  Accepting the lowest range of Hackman's own estimates, a conservative approximation is that Hackman earned disgorgeable amounts from EAD Law of $21,879 in 2016 (45% of $48,622), $37,073 in 2020 (45% of $82,385), and $2,542 in 2021 (45% of $5,650).

57.     Hackman was not specifically asked what percentage of his income that came directly from clients related to SEC filings.  While likely a significant underestimate, it is reasonable to assume that, at a minimum, the same percentages apply to that income

---

[37] $110,765 (2017 income) + $215,300 (2018 income) = $326,065.

as well.[38]  Accordingly, a conservative estimate is that Hackman earned a disgorgeable amount of $146,184 (45% of $324,854) from these payments.

58.     Using the calculations detailed above, from January 1, 2016 through late May 2021 Hackman earned a conservative estimate of $817,438 in disgorgeable income as a result of violating the 2002 Order:

| Source of Income | Income | % of Income from SEC Filings | Disgorgeable Income |
|---|---|---|---|
| Gewerter 2016 | $476,494 | 75% (p. 216 of Hackman Tr.) | $357,370 |
| Gewerter 2017 | $2,390 | 75% (extrapolating from earlier period) | $1,792 |
| EAD 2016 | $48,622 | 45% (extrapolating from 2017-18) | $21,879 |
| EAD 2017-18 | $326,065 | 45% (p. 214-15 Hackman Tr.) | $146,729 |
| EAD 2019 | $207,739 (includes $1,790 in electronic payment) | 50% (p. 215 Hackman Tr.) | $103,869 |
| EAD 2020 | $82,385 (includes $3,400 in electronic payment) | 45% (using lower EAD figure) | $37,073 |
| EAD 2021 | $5,650 | 45% (using lower EAD figure) | $2,542 |
| Payments directly to Hackman | $324,854 | 45% (using lowest figure) | $146,184 |
| **TOTAL** | | | **$817,438** |

## POINTS AND AUTHORITIES

59.     The SEC brings this Application pursuant to authority conferred on it by Sections 21(d)(5) and 21(e)(1) of the Exchange Act ,15 U.S.C. §§ 78u(d)(5) and 78u(e)(1). In particular, Section 21(e)(1) of the Exchange Act provides that, upon application of the Commission, the district courts of the United States have jurisdiction to issue writs of

---

[38] The 45% figure is based on Hackman's estimate that 40% of his income at EAD Law derived from litigation work, but few if any direct payments from clients are likely to have been for litigation work because he could not appear in court or take depositions.  Thus, the Commission could argue for disgorgement of nearly all his direct client income.

mandamus, injunctions, and orders commanding any person to comply with Commission administrative orders instituted pursuant to the Exchange Act.  "[S]ection 21(e) contains a provision explicitly vesting district courts with jurisdiction, on application of the SEC, to issue 'orders commanding . . . any person to comply with [the Exchange Act], [and] the rules, regulations, *and orders* thereunder." *Lang v. French*, 154 F.3d 217, 220 (5th Cir. 1998) (italics in original); *see also SEC v. McCarthy*, 322 F.3d 650, 655 (9th Cir. 2003) ("Section 21(e) of the Exchange Act expressly permits the Commission to seek enforcement of its orders by making application to the district court."); *SEC v. Vittor*, 323 F.3d 930, 935 (11th Cir. 2003) (same).  "The Exchange Act does not limit or restrict what types of Commission orders may be enforced through § 21(e) other than to state that the Commission's order must have been issued pursuant to the Exchange Act or the rules and regulations promulgated thereunder." *McCarthy*, 322 F.3d at 655.  A Rule 102(e) suspension is issued pursuant to the Commission's authority under the Exchange Act, and can thus be enforced through a Section 21(e)(1) action.  *See, e.g., SEC v. Vinson*, 3:19-MC-0075-K, N.D. Tex. March 2, 2020, Dkt. No. 9, attached as Ex. 154 ("Vinson Order") (finding an attorney violated his Rule 102(e) suspension and ordering him to comply and pay disgorgement); *SEC v. Moore*, 2017 WL 1404318, at *9 (D. Nev. April 18, 2017) (same as to accountant); *SEC v. Jones*, 155 F.Supp.3d 1180 (D. Utah 2015) (same as to an accountant); *SEC v. Taber*, 2013 WL 6334375 (S.D.N.Y. Dec. 4, 2013) (same as to an accountant).

60.     Section 21(e) authorizes summary proceedings "'without formal pleadings, on short notice, without summons and complaints, generally on affidavits, and sometimes even *ex parte*,'" *McCarthy*, 322 F.3d at 655 (quoting *New Hampshire Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 406-07 (1960)), because, "[b]y the time a § 21(e) application is filed by the Commission, the time and opportunity for adjudicating the merits of the claim have been exhausted; all that is left to do is enforce the order," *id.* at 658; *see also SEC v. Gerasimowicz*, 9 F.Supp.3d 378, 381 (S.D.N.Y. 2014) ("[L]itigants are precluded from challenging the

34

validity of SEC orders in enforcement proceedings initiated pursuant to . . . Section 21(e)(1) of the Exchange Act."); *SEC v. Securities Inv'r Protection Corp.*, 842 F.Supp.2d 321, 326 (D.D.C. 2012) (following holding in *McCarthy* "that Congress' use of the word 'application' in Section 21(e) of the Securities Exchange Act permitted the use of summary proceedings to enforce an order of the Commission").

**A. Hackman's Work Constituted Appearing or Practicing Before the Commission.**

61.      The purpose of Rule 102(e) is to protect the integrity of the Commission's processes. *See Touche Ross & Co. v. SEC*, 609 F.2d 570, 582 (2d Cir. 1979) (noting that Rule 102(e) was adopted as a "means to ensure that those professionals, on whom the Commission relies heavily in performance of its statutory duties, perform their tasks diligently and with a reasonable degree of competence"). The Commission can thus suspend an attorney from appearing or practicing before it for various types of misconduct, including having been disbarred—the basis for Hackman's suspension.[39] *See* SEC Rule of Practice 102(e)(2), 17 C.F.R. § 201.102(e)(2).

62.      Rule 102(f) provides that "practicing before the Commission shall include, but shall not be limited to: (1) Transacting any business with the Commission; and (2) The preparation of any statement, opinion or other paper by an attorney, accountant, engineer or other professional or expert, filed with the Commission in any registration statement, notification, application, report or other document with the consent of such attorney, accountant, engineer or other professional or expert." 17 C.F.R. § 201.102(f). Hackman's work clearly constituted appearing or practicing within the meaning of Rule 102(f): He "transacted business" with the Commission by communicating with SEC staff on behalf of

---

[39] The Commission may suspend a disbarred attorney to protect its processes should the disbarred attorney later regain their law license, or (like Hackman) attempt to appear or practice before the SEC in violation of a disbarment. *See, e.g., In re Richard Jeffrey Rubin*, Exchange Act Release No. 88258 (Feb. 21, 2020) (suspending disbarred attorney who held himself out as an attorney and functioned as such on SEC filings), *available at* https://www.sec.gov/litigation/admin/2020/34-88258.pdf.

clients at least twice, he willingly prepared almost innumerable documents (including opinions, registration statements, notifications, and reports) he knew would be filed with the Commission, and he consented both explicitly and implicitly to those filings.

**B. Hackman's Work Constituted the Practice of Law, and thus he was Appearing or Practicing "As an Attorney" Within the Meaning of the 2002 Order.**

63.       Under Nevada law, Hackman's work discussed throughout this Application constituted the practice of law.  *See In re Lerner*, 124 Nev. 1232 (2008) (*en banc*).  In *Lerner*, the court stated that "the overarching principle [is] that the practice of law is involved when the activity requires the exercise of judgment in applying general legal knowledge to a client's specific problem."  *Id.* at 1234.  Among the activities that constitute the practice of law is "advising a client about his or her legal rights and recommending future actions." *Id.* at 1241-42.[40]  The court elaborated that the "practice of law is implicated whenever a person is faced with a legal issue that cannot be handled by resort to routine forms or customs, and when the person makes a decision not to rely on his or her own judgment but to obtain assistance from someone else, a stranger to the situation."  *Id.* at 1238.  Here, Hackman relied on his professional judgment, formed during the time when he was a licensed attorney, to routinely and continuously advise clients about their legal obligations

---

[40] Agreeing to undertake a representation (*see, e.g.,* Ex. 155/TE 1046) itself requires the exercise of professional judgment and it, as well as serving as the sole client contact at the firm (*see, e.g.,* Ex. 14 (Iarocci Tr. at 56:2-57:14), likewise constitute the practice of law. *Lerner*, 124 Nev. at 1241; *see also In re Arase*, 129 Nev. 1124 (Table), 2013 WL 690938, at *1 (Feb. 22, 2013) (California attorney engaged in the unauthorized practice of law by retaining Nevada clients).  While *Lerner* said that being the "sole" client contact was problematic, other cases make clear that substantive client contact itself can be problematic. *See, e.g., In re Crowley*, 132 Nev. 984 (Table), 2016 WL 2742371, at *1 (May 9, 2016) (pointing to a "meeting with a client to review a trust document" as one of the improper actions and citing approvingly to an out-of-state case that held that "while an attorney who has been suspended from the practice of law is permitted to work as a paralegal or similar for a licensed attorney, the suspended lawyer's functions must be limited exclusively to work of a preparatory nature under the supervision of the licensed attorney and must not involve client contact.").  Hackman was, at the very least, the primary point of contact for legal issues and filings for numerous clients.

with regard to the variety, intricacies, and nuances of SEC filings, including the form, substance, and legal requirements related thereto.  As detailed above, clients hired him specifically to function as their attorney—not as their "paralegal."  By the terms of *Lerner* (and any reasonable definition), Hackman plainly engaged in the practice of law.

64.     *Lerner* concerned a duly licensed out-of-state attorney.  Concerns are heightened when, as here, a "paralegal" is a disbarred or suspended attorney.  This Court has recently explained that it "is of utmost importance that a suspended attorney ensures and guards against any misunderstanding about whether the attorney is authorized to practice law[,] and he bears the burden of making sure clients are clear on the attorney's status."  *In re Dickerson*, 2019 WL 6790651, at *3 (D. Nev. Dec. 12, 2019).  Dickerson never "sign[ed] pleadings, attend[ed] depositions, or ma[d]e court appearances.  However, Dickerson's work was all substantive legal work in nature" including "drafting legal documents," even though a licensed attorney signed all pleadings and "reserved control and authority over the case."  *Id.* at *2.  Similarly, while Hackman never signed *his* name to any opinion or allowed his name to be put on SEC filings, it is clear that he was doing the substantive legal work (including providing related legal advice) on these filings.  This case is even more egregious than *Dickerson* because, unlike in that case, Gewerter and Dowling did not maintain control or authority over Hackman's work product—they had minimal, if any, involvement in most filings.[41]

_____

[41] Courts around the country agree that preparing substantive legal documents can constitute the practice of law even if an attorney reviews the filing and/or puts his or her name on the document.  *See, e.g., In re Friedberg*, 144 N.Y.S.3d 183, 186 (N.Y. App. Div. 1st Dep't. 2021) ("Activities like preparing memoranda and documents to be filed in court—even if subscribed to by an admitted attorney—or conducting interviews with clients are forbidden to a suspended or disbarred attorney."); *In re Chavez*, 129 N.M. 35, 42-43 (2000) (finding a suspended attorney's drafting of documents signed by another lawyer to be the practice of law after refusing "to adopt a definition of the practice of law that is limited to signing pleadings or appearing in court on another's behalf" and noting that "where the individual charged with unauthorized practice of law has had legal training, his activities are subject to even closer scrutiny") (citation omitted); *In re Raskin*, 217 A.D.2d 187, 188-89 (N.Y. App. Div. 2d. Dep't. 1995) (suspending an attorney who allowed a disbarred attorney to advise on a lawsuit and draft various legal papers, even where the attorney reviewed the papers

65.     Dickerson was also faulted for failing to clearly identify himself as a paralegal, and there was at least one instance where the client referred to him as an attorney.  2019 WL 6790651, at *2.  Here, Hackman was repeatedly referred to as an attorney by clients and various third parties, yet did nothing to correct these misimpressions—and at times appeared to actively foster the impression that he was an attorney (*see, e.g.*, his business card).  *See also In re Crowley*, 133 Nev. 1027 (Table), 2017 WL 5952887, at *1 (Nov. 29, 2017) (finding an attorney violated Rules 5.5 and 8.4(d) when he advised clients but "failed to ensure that [his clients] knew he was a suspended attorney").

66.     Finally, at least at times, Dickerson billed the client directly for his services, which "is a classic function and responsibility of the practicing attorney."  *Id* at *3.  Hackman also billed numerous clients directly for his services, including receiving shares in several companies as compensation.

67.     Hackman plainly appeared or practiced as an attorney before the Commission within the meaning of Rule 102(f) and Nevada law.  In doing so, he violated the Commission's 2002 Order.  The Commission respectfully requests the Court enter an order finding that Hackman violated the 2002 Order, and order him to comply with the 2002 Order going forward.

---

before filing, because such work constituted the practice of law); *In re Wood*, 408 B.R. 841, 853 (Bank. D. Kan. 2009) (licensed lawyer aided in the unauthorized practice of law where he performed a "perfunctory review of the papers" drafted by paralegals or out-of-state lawyers); *In re Brandes*, 2015 WL 4664743 (N.Y. App. Div. 2d Dep't. June 3, 2015) (rejecting reinstatement request because suspended attorney violated his suspension by "draft[ing] briefs and other litigation papers for other attorneys" and providing legal advice to other attorneys, who were less experienced than he); *In re Devers*, 328 Or. 230, 238 (1999) (revising a settlement agreement "is the work of a lawyer, not a scrivener" and the "intentional failure to disclose a suspension" constituted a material omission and a separation ethics violation).

**C. Disgorgement of the Compensation Hackman Received for Work Performed in Violation of the 2002 Order is Appropriate.**

68.     Courts can order disgorgement in order to recover fees earned for work in violation of a Rule 102(e) suspension, depriving the violator its ill-gotten gains.  *See Jones*, 155 F.Supp.3d at 1191 (ordering disgorgement of accounting fees earned in violation of a Rule 102(e) suspension); *Moore*, 2017 WL 1404318, at *10 (same); *Taber*, 2013 WL 6334375 (same); *see also* Ex. 154 (Vinson Order).

69.     "Disgorgement need be only a reasonable approximation of profits causally connected to the violation."  *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal citations omitted).  Once the Commission provides a reasonable approximation of profits connected to the misconduct, "the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation."  *Id*. Any "risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty."  *Id*.; *see also SEC v. Funinaga*, 2015 WL 356291, at *5 (D. Nev. Jan. 27, 2015) (defendant failed to show the SEC's disgorgement calculation was unreasonable, particularly because "[a]ny uncertainty in calculating disgorgement is construed against defendants in light of their illegal conduct").

70.     Hackman was paid approximately $817,438 for work that violated the 2002 Order.  *See* Facts Section II, above.  As detailed in that discussion, the Commission's estimate is not just reasonable, but conservative.

## CONCLUSION

Based on the above, this Court should

(A)     After the Commission notifies the Court that it has effectuated service, set a schedule for Hackman to submit any opposition papers and the Commission to submit any reply;

(B)     Enter an order enforcing compliance with the 2002 Order;

(C)     Order Hackman to disgorge $817,438, representing the compensation gained as a result of his engaging in work that was proscribed by the 2002 Order, together with prejudgment interest thereon;

(D)     Grant the Commission such other and further relief as may be necessary and appropriate; and

(E)     Retain jurisdiction over this matter for the purpose of enforcing Hackman's compliance.

Respectfully submitted this 30th day of June, 2021.

THOMAS J. KARR
Assistant General Counsel

*/s/ Eric Reicher*
ERIC REICHER
Special Trial Counsel

KAREN J. SHIMP
Special Trial Counsel
U.S. Securities and Exchange Commission

## Certificate of Service

I hereby certify that on June 30, 2021 I electronically filed the foregoing **Application for an Order Under Section 21(e)(1) of the Securities Exchange Act of 1934 Enforcing Compliance With a Commission Order, and Brief in Support** with the Clerk of the Court for the United States District Court for the District of Nevada using the CM/ECF system

Dated this 30th day of June 2021.

*/s/ Eric Reicher*
Eric Reicher
Special Trial Counsel
U.S. Securities and Exchange Commission

40

| | |
|---|---|
| 1 | **APPENDIX A** |
| 2 | Allure Worldwide, Inc. |
| 3 | Alpha Energy, Inc. |
| 4 | American Heritage International, Inc. |
| 5 | Anfield Acquisitions, Inc. |
| 6 | Apex 11, Inc. |
| 7 | Arrington Jones, Inc. |
| 8 | AS Capital, Inc. |
| 9 | Astika Holdings, Inc. |
| 10 | Atlantic Acquisition, Inc. |
| 11 | Atlantic Acquisition II, Inc. |
| 12 | BestGofer, Inc. |
| 13 | Bioadpatives, Inc. |
| 14 | Biocrude Technologies, Inc. |
| 15 | C Wolters Consultants, Inc. |
| 16 | Celexus, Inc. |
| 17 | Cheval Resources Corp. |
| 18 | Cyclone Power Technologies, Inc. |
| 19 | Darkstar Ventures, Inc. |
| 20 | DAS Acquisition, Inc. |
| 21 | DCA Asset Management, Inc. |
| 22 | Dewmar International BMC, Inc. |
| 23 | Downkicker, Inc. |
| 24 | Energy Alliance Technology Corp. |
| 25 | Energy Conversion Services, Inc. |
| 26 | Farstar, Inc. |
| 27 | Flashapp, Inc. |

| | |
|---|---|
| 1 | Friendable, Inc. |
| 2 | Glohab, Inc. |
| 3 | Gold Standard Mining Co. |
| 4 | GP Solutions, Inc. |
| 5 | Granito Acquisition I, Inc. |
| 6 | Grow Pod Solutions, Inc. |
| 7 | Help Worldwide, Inc. |
| 8 | Joblocationmap, Inc. |
| 9 | Kinetic Group, Inc. |
| 10 | Lane Capital Corp. |
| 11 | LGH Group US, Inc. |
| 12 | Lucent, Inc. |
| 13 | Megas, Inc. |
| 14 | Mobad Service Corp. |
| 15 | NAS Acquisition, Inc. |
| 16 | Optimum Source International, Ltd. |
| 17 | Pacific Oil Co. |
| 18 | PC Mobile Media Corp. |
| 19 | Perk International Inc. |
| 20 | Perlowin Development Corp. |
| 21 | Prudent Senior Services of America, Inc. |
| 22 | Puravita Corp. |
| 23 | Remsleep, Inc. |
| 24 | Sanz Solutions, Inc. |
| 25 | SEC of America Corp. |
| 26 | Sector 5, Inc. |
| 27 | Sharp Holding Co. |

Appendix A p. 2

1    She Beverage Company, Inc.

2    Shengshi International Holding Group, Inc.

3    SigmaRenPro, Inc.

4    Skilift, Inc.

5    Social Detention, Inc.

6    Stark Naked Bobbers

7    Stuart King Capital Corp.

8    Tenaya Acquisitions Co.

9    Tenaya Group, Inc.

10   Thomas Capital Corp.

11   Tiburon International Trading Corp.

12   Tiger Oil & Energy, Inc.

13   Tipmefast, Inc.

14   Tomichi Creek Outfitters

15   Tribus Enterprises, Inc.

16   Triton Acquisition Co.

17   Ultimate Holdings Corp.

18   United People Power, Inc.

19   Uppersolution.com

20   Urban Seed Vegas I, LLC

21   US-Dadi Fertilizer Industry International, Inc.

22   U.S.-MHJ Wooden Elegance Creations International, Inc.

23   US-Nobel Primary Education Development International, Inc.

24   Vegas Rental Development, Inc.

25   Wellness Matrix Group, Inc.

26   Whiskey Acquisitions, Inc.

27   ZYQC Group Holding Ltd.

**APPENDIX B**

| Form | Description |
| --- | --- |
| **1-A** | Regulation A Offering Statement |
| **S-1** | Registration statement under Securities Act of 1933 |
| **S-1A** | Amended registration statement |
| **10** | General form for registration of securities pursuant to Section 12(b) or (g). [Sometimes appropriate instead of an S-1] |
| **10-K** | Annual report |
| **10-Q** | Quarterly report |
| **8-K** | Current report pursuant to Section 13 or 15(d) [Used to report material items between quarterly statements] |
| **12b-25** | Notification of late filing |
| **15** | Certification and notice of termination of registration under Section 12(g) or suspension of duty to file reports under Sections 13 and 15(d) |
| **3** | Initial statement of beneficial ownership of securities |
| **4** | State of changes in beneficial ownership of securities |
| **D** | Notice of Exempt Offering of Securities |
| **ID** | Application for access codes to file on EDGAR |